JOHN SHERMAN v. STATE.

184 So. 843.
Opinion Filed December 1, 1938.
Rehearing Denied December 20, 1938.

*Ralph C. Binford,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

BUFORD, J.—The writ of error brings for review judgment of conviction of the offense of perjury.

The plaintiff in error in brief has posed four questions for our consideration, as follows:

"In a prosecution for perjury based upon alleged false testimony in a Circuit Court in a proceeding supplemental to execution under Chapter 7842, Acts of 1919 (C. G. L., Section 4540 *et seq.*) is the jurisdiction of the Circuit Court in such supplemental proceeding so established as to support a judgment of conviction when it does not appear that the execution upon which said proceeding purported to be based had been returned unsatisfied (or otherwise) to the Clerk or Court issuing the same when said supposed proceeding was instituted, nor when said testimony was given?

"2. In a prosecution for perjury, when it affirmatively appears from the evidence adduced by the State that the defendant in the same proceeding in which the supposedly false testimony was given, and before the conclusion of the taking of testimony therein, again testified and corrected the supposedly false statements, can the charge of perjury be maintained?

"3. If the lower court was correct in its holding in repect of the last preceding question, then should such a correction of testimony by a witness be deemed not to be voluntary when no direct evidence is adduced by the State to prove that such correction was not voluntary?

"4. Can a conviction of perjury be sustained when no evidence of the falsity of the allegedly false testimony is adduced at the trial except the report of the subsequent testimony of the defendant in the case in which the supposed perjury is alleged to have been committed, in which latter testimony such defendant acknowledged that incorrectness of his prior testimony and corrected the same?"

The first question may be answered by saying that the record shows that in the proceedings in which it was alleged the act of perjury was committed, affidavit was filed in the following language:

"In The Circuit Court of The Thirteenth Judicial Circuit of The State of Florida

"Stovall Properties, Inc., a corporation, Plaintiff, v. The Mirror, Catering, Inc., a corporation, Defendant.

"Affidavit for Proceedings Supplementary to Execution.

"State of Florida
"County of Hillsborough.

"Before me, the undersigned authority, on this day personally appeared H. J. Watrous, Jr., who being by me first duly sworn, says that he is agent for Stovall Properties, Inc., Plaintiff in the above styled cause; that on to-wit, the 24th day of June, A. D. 1937, execution in favor of the plaintiff and against the defendant in the sum of One Thousand Four Hundred Twenty-three and 75-100 Dollars ($1,423.75) was issued in said cause; that said execution was placed in the hands of the Sheriff of Hillsborough County, for execution; that said Sheriff levied on property of the defendant of the value of Two Hundred Fifty Dollars ($250.00); that said execution remains in the hands of the Sheriff unsatisfied as to the remainder of the amount of said execution, to-wit, the sum of One Thousand One Hundred Seventy-three and 75/100 Dollars ($1,173.75) together with costs of said levy; that the return of the Sheriff on said execution so shows said execution to be unsatisfied as to the balance of the amount of said execution and that said Sheriff has been unable to locate any other property of the defendant upon which levy can be made; that said execution is valid and outstanding; that the defendant is a corporation organized and existing under and by virtue of the laws of the State of Florida with its principal place of business in Hillsborough County, Florida; that the officers of said defendant corporation insofar as affiant has been able to determine are Frank Hunter,

President, Beatrice Hunter, Secretary, J. J. Schoenborn, Manager, all and each of them residents of Tampa, Hillsborough County, Florida.

H. J. WATROUS, JR.

"Sworn to and subscribed before me this 13th day of July A. D. 1937.

"(SEAL) Lilla W. Griffin, Notary Public.

"(Indorsed as follows:)

" '21664-L In the Circuit Court of the Thirteenth Judicial Circuit of the State of Florida. Stovall Properties, Inc., a corporation, Plaintiff, v. The Mirror, Catering, Inc., a corporation, Defendant. Affidavit for Proceedings Supplementary to Execution. Filed and docketed July 14, 1937. CHAS. E. CULBREATH, Clerk, by Odis E. May, D. C. Claibourne M. Phipps, Attorney for Plaintiff.' "

Thereupon the following order was entered:

"IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA

"STOVALL PROPERTIES, INC., a corporation, Plaintiff, v. THE MIRROR, CATERING, INC., a corporation, Defendant.

"ORDER

"This cause coming on this day to be heard upon affidavit of plaintiff that execution in this cause is in the hands of the Sheriff of Hillsborough County, with a return thereon showing said execution to be unsatisfied, it is thereupon upon consideration thereof:

"ORDERED, ADJUDGED AND DECREED that the defendant, The Mirror, Catering, Inc., a corporation, and Frank Hunter, Beatrice Hunter and J. J. Shoenborn, alleged to be President, Secretary and Manager, respectively of said corporation, and each of them be and appear before the undersigned, L. L. Parks, one of the Judges of the above Court,

at his office in the Court House in the City of Tampa, Florida, at the hour of 9 o'clock in the forenoon on the 3rd day of August, A. D. 1937, then and there to be examined concerning the property of The Mirror, Catering, Inc., a corporation.

"DONE AND ORDERED in Chambers at Tampa, Florida, this 14th day of July, A. D. 1937.

"L. L. PARKS, Judge."

This order was duly served. The affidavit was not traversed nor any of the allegations thereof denied. The affidavit above quoted contained all necessary allegations to give the Court jurisdiction to conduct the proceedings and to issue the order above quoted. The service of the order brought the parties before the court.

We, therefore, now consider the remaining questions together.

Subpoena was issued and served on the accused John Sherman and in response thereto he appeared before the Honorable L. L. Parks, and testified concerning a matter then and there material to the proceeding supplemental to execution. The record shows that John Sherman then and there in regard to such material matter knowingly, wilfully and designedly testified and deposed falsely. This occurred on the 16th and 17th day of August, 1937. Thereafter, on the 6th day of December, 1937, after the truth about the matter about which Sherman had testified had become known, he was again summoned before the Court and then it was that he testified as follows:

"MR. WOLF:

"Q. Mr. Sherman, you are Manager of the City Transfer Company? A. Yes, sir.

"Q. You remember a hearing we had in this court previous to this? A. Yes, sir.

"Q. —regarding some equipment that came from the Mirror, Catering Company? A. Yes, sir.

"Q. Do you remember the date of the hearing? A. Yes, on August 16, I think.

"Q. At the time that you testified before this court, I believe you testified that you had not seen the ice box or freezer show case or electric refrigerating unit, upon the date of that hearing was that freezer showcase in your possession? A. No, sir.

"Q. Was it in the City Transfer warehouse? A. No, sir.

"Q. Do you know where that case was? A. I sent it to St. Petersburg.

"Q. Who did you send it to? A. The Blocker Transfer Company.

"Q. Why did you send it? A. To get it out of the warehouse; to get it out of my possession.

"Q. Did you anticipate that they would look for it in your warehouse? A. I was afraid they would, yes, sir.

"Q. Did you have any interest in that box. A. A little bit, owed about a hundred dollars. .

"Q. Did you move that freezer showcase to the Blocker warehouse in St. Petersburg? A. Yes, sir.

"Q. Did you realize the position you were placing yourself in?

"A. No, sir.

"Mr. Wolf: (to Mr. Phipps) Is that the same case?

"Mr. Phipps: Yes, that is the same case.

"Mr. Wolf: Q. Is that case over there, to your knowledge, the same case that came out of the Mirror here?

"A. Yes, I am pretty sure it is.

"Q. Is the case in the same condition it was when it was taken out of there? A. I do not know about that; it was in a pretty bad fix, in bad shape.

"Q. Have you an interest in that case at the present time?

"A. The Mirror owed me around $90 for moving.

"Q. The Mirror owes you that? A. Yes, sir.

"Q. Did you ever collect anything?' A. No, sir, never collected a penny.

"Q. Are you willing, without cost to Pallardy-Watrous or Stovall Properties, to bring that case back to Tampa?

"A. Yes, sir.

"Q. —and turn it over to them? A. Yes, sir. Or keep it in the warehouse until they can dispose of it without cost to them.

"Q. As a matter of record here, I want to ask you this question: When that case was moved to St. Petersburg did Mr. Frank Hunter know it was moved there? A. No, sir.

"Q. Did he know you had it? A. He thought I had it but he did not know it.

"Q. He did not know you moved it? A. No, sir.

"Q. And did not know where it was? A. No, sir, did not know where it was.

"By Mr. Phipps:                    Cross Examination.

"Q. Mr. Sherman, when did you first get possession of that refrigerating unit? A. I think it came in the Sunday that we moved them.

"Q. It was moved by your truck, was it? A. Yes, sir.

"Q. It was placed in the warehouse? A. Yes, sir, in my warehouse.

"Q. Who gave instructions for it to be moved from there, you?

"A. From where it was?

"Q. Yes, from the Mirror. Who instructed your truck to move it from there, did you do that? A. Yes, sir, I did.

"Q. You knew that was moved and put in your warehouse?

"A. I am pretty sure it was.

"Q. As a matter of fact, you knew it? A. Not until this thing came up, because I had not taken a list of it, I supposed it was there.

"Q. At the time the sheriff levied a distress warrant there upon certain property as coming from the Mirror, you knew at that time that the freezer case was there?

"A. I thought it was where the other stuff was.

"Q. You knew the sheriff's office did not get it under that distress warrant? A. I am pretty sure he did not.

"Q. As a matter of fact, did not that property stay in your warehouse until you were served with that subpoena to testify here on August 16th and up to the time you took it to St. Petersburg? A. Yes, sir."

He further testified as follows:

"Q. When you testified on former occasions that you did not know where this stuff was, other than what the sheriff got, you were still trying to keep us from locating that, were you not? A. I cannot say that I did; I was trying to protect myself on it.

"Q. And trying to protect Frank Hunter too?

"A. No, sir, trying to protect our interest in it.

"Q. Did anyone advise you that you could protect your interest in testifying falsely before the court, to protect a $90 hauling claim? A. No, sir. Things came up and I did not mean to if I did.

"Q. You did testify you did not know where this stuff was other than what the sheriff got, didn't you? A. Yes; that is right.

"Q. You also testified you did not know what became of the refrigerating unit, didn't you? A. Yes, I did."

Now this was not a case where a witness inadvertently or otherwise testified falsely and then voluntarily corrected and repudiated his false testimony, but here he testified falsely

to gain an advantage to himself and months afterward, when the truth had become known, and when the false testimony could serve him no longer, he admitted the falsity of his former testimony.

This answers all the questions presented.

There appears no reversible error disclosed by the record and, therefore, the judgment must be affirmed.

It is so ordered.

Affirmed.

TERRELL, C. J., and WHITFIELD, BROWN and CHAPMAN, J. J., concur.